# EXHIBITIONS A-I

# With IFP

# Exhibit Sheet

EXHIBIT A - Benefits

EXHIBIT B - 1040 2023

EXHIBIT C - Mortgage (3pages)

EXHIBIT D - Bank

EXHIBIT E - Sewer and Stormwater

EXHIBIT F - Electricity

EXHIBIT G - Car

EXHIBIT H - National Debt Relief

EXHIBIT I - YMCA

EXHIBIT J - Documentation of Attack (6 pages)

EXHIBIT K - Theresa Statement (3 pages)

EXHIBIT L - Sadia Statement (2 pages)

EXHIBIT M - Jason's Injury

EXHIBIT N - Head Scan (2 pages)

EXHIBIT O - Maxillofacial (2 pages)

EXHIBIT P - Spinal Scan (2 pages)

EXHIBIT Q - Rib Scan (2 pages)

EXHIBIT R - Nov Head (2 pages)

EXHIBIT S - Neck Feb (3 pages)

EXHIBIT T - Medical Records (Digitally Uploaded)

EXHIBIT U - Dropped off Testimony and Med Records

EXHIBIT V - Chardo 1

EXHIBIT W - Chardo 2

EXHIBIT X - Request to Investigate (2 pages)

EXHIBIT Y - 1st Violation

EXHIBIT Z - Cease and Desist

EXHIBIT AA - Right to Know (2 pages)

EXHIBIT BB - Response to RTK (2 pages)

EXHIBIT CC - Public Speaking

EXHIBIT DD - Request for Meeting Denial (2 pages)

EXHIBIT EE - Selective Letter from Swartz (2 pages)

EXHIBIT FF - Veteran Status Shared

EXHIBIT GG - Police Report

EXHIBIT HH - Disabled Veteran Real Estate Tax Exempt

EXHIBIT II - Floyd Statement

EXHIBIT JJ- Diana Statement

EXHIBIT KK - Veterans Administration Psychiatrist Opinion (Reserved)

EXHIBIT LL - Veterans Administration Physician Opinion (Reserved)

EXHIBIT J

Documentation from Attack on Thursday, September 26, 2024

Thursday, September 26, 2024
Beth's Account:

I was at a stop, getting ready to make a right on red (red circle in Google map picture below) at the intersection of N. Lingle Ave and E. Chocolate Ave. William Shoemaker, walking, crossed N. Lingle Ave and hit my car as he walked past.  Jason and I looked at each other like, "what the hell just happened?"  I proceeded to make the right turn and then left into the parking lot of Pho Miss Saigon.



As Jason, myself, and our son, Jackson were getting out of the car and walking towards the restaurant, Jason heard William yelling at us.  I continued into the restaurant with our son while Jason approached William to talk about hitting our car (red x on Google Map above).

When Jason didn't come into the restaurant, I approached the door to see what was going on.  A family of 3 was sitting by the window.  The man told me that my husband (the guy in the light blue shirt) was attacked by the other guy.  I asked the man if my husband hit the guy back.  He said that my husband did not hit the guy, but he did put him in a headlock after the other guy hit him.  He stated that my husband was talking to the man, and when my husband turned around to walk away, the guy hit him.  I then asked the guy if he'd give a statement to the cop.  He said that he would.  I'm unsure if he did or not.  The guy working at the Pho restaurant

was also watching the scene unfold when he wasn't getting drinks/food. I'm not sure of this man's name. I only remember he had a soft, high pitched voice.

Someone called the police and William picked up his things and left the scene. When the police arrived, I told Office Shearer that I was the one driving the car when "the man" (William) hit our car. Officer Shearer asked if I witnessed anything else. I told him that I did not, as I was not in an area of the restaurant that was viewable to the street. Officer Shearer told me that he called an ambulance to come and check Jason out because he was hit in the head. Officer Shearer said he didn't understand why Jason's face was cut. I told him that William had a canvas bag, which happened to be the bag he hit Jason with. Officer Shearer said that it must've been the buckles that got Jason in the face/head. I then took pictures of the blood running down Jason's face. When the ambulance got there, I went back inside the restaurant while they cleaned Jason up. Officer Shearer did not take pictures of Jason's face for evidence.

After the ambulance left, Officer Shearer told Jason that he was going to talk to William about the incident. Another officer had found him and spoken to him already, but Officer Shearer said that he wanted to talk to him too. He said to Jason, "If I charge him, you will testify right?" Jason said he absolutely would. Officer Shearer said that he was going out of town for the weekend, but he would be in contact with Jason on Monday, after 7pm, to check on him. He told us to get Jason's statement in as soon as we could.

Jason's account:
+ William hit our car with his bag as he walked past.
+ When my family and I got out of the car, William started yelling things at us.
+ I crossed the street to talk with him and to see why he was hitting our car and yelling at us. I heard him yell "what's up soldier" in a demeaning way and saw him holding his hands up.
+ I asked William why he hit our car and was yelling stuff at me and my family. William wasn't saying anything, so I turned around to leave.
+ The next thing I knew, my head hurt and I felt William grabbing me around the waist.
+ I put him in a headlock and told him that he needed to let go.
+ William let go, then I let go and sat down on the curb. William gathered his things that were strewn about on the sidewalk and took off.
+ Bystanders/witnesses from the hotel took video and called the police.
+ Officer Shearer stayed with me and called an ambulance to have me checked out since I was hit in the back of the head and had blood on my face.
+ While the paramedics were provided treatment, Officer Shearer was questioning me as to what happened. The paramedics asked Officer Shearer if they needed to stop treatment to let Officer Shearer question me. Officer Shearer let them proceed. The paramedics told me that I most likely had a concussion.
+ I told Officer Shearer that I didn't want to answer questions at that point because my head hurt and I was dizzy. I just wanted to get home.
+ Officer Shearer gave me a form to fill out and told me to get it back to him. He said he wanted to go talk to William himself after speaking with me, and he asked me if I'd testify

against William if he pressed charges. I said I definitely would, as William had just attacked me.

Friday, September 27, 2024
      Jason texted me at work and told me that he was feeling worse as the day went on and he needed to go to the ED. As soon as I got home, Jason showed me his side that was bruised up. I took a picture with his phone, but it was lost when Jason's phone broke. We then headed to the Veteran's Hospital (VA) in Lebanon, PA. I dropped Jason off at the ED door and parked. By the time Jackson and I arrived in the building, the staff was placing Jason in a wheelchair due to his light-headedness. They took him to a room to examine him. Jackson and I went to see Jason while we waited on the results of the tests. The room was dark due to Jason's light sensitivity and headache. Jason told me that they noticed 2 places where he was hit in the head. The doctor came in and said that Jason had a traumatic brain injury (TBI)/concussion and since Jason's head was hit 2 times, his recovery may take longer.

Days/Weeks Following incident:
- 9/26/24- We notified Jason's employees that he was attacked and had a concussion.
- 9/27/24 - I took Jason to the Emergency Department at the VA hosplt was determined that he had a concussion/TBI from being hit 2 times in the head, his face was cut up, and his ribs were bruised.
- 9/28/24- Jason notified his employees that he was still having symptoms of a concussion and he noticed his thoughts were blurred and he was easily agitated: "not (in) the condition to run a company." He began delegating tasks.
- 9/29/24 - Jason realized that if something were to happen to him, no one could run his company, so he needed to make a list of things to remember and get things in place so that someone could take over in his absence. He again stated that he was "in a really shitty mood because of this concussion," and stated "If I do anything that is not in character, please give me the benefit of the doubt." He also requested video chat rather than texting and emailing.

      Jason was also supposed to be helping a homeless Vet get his house back in livable conditions. He had to cancel plans for this.
- 9/30-10/1- Jason tried to work, but people were having difficulty following what he was saying. He was agitated and stressed.
- 10/1/24 - Follow up with Physician Assistant to assess injuries. Jason was issued a cane to use for when he felt dizzy or had to walk long distances.
- 10/1/24- Spoke with psychiatrist about attack.
- 10/2/24 - I made Jason take a day off of work and instructed his employees not to contact him.
- 10/3/24- Fired 3 of his employees because they couldn't keep up with his demands. I tried explaining to Jason that I was listening to him and he was moving so fast with his thoughts and he wasn't really making sense. He didn't care. These are the same people that he gave 800 dollars to so their mom could get her hip set after a fall.
- **10/7/24- Around 4:36 pm, I dropped off the medical records and Jason's statement to the officer behind the glass.**

- 10/22/24- Optometry visit to evaluate vision disturbances post attack.
- 10/22/24 - Jason talked with Primary Care Physician (PCP) about the attack and his symptoms.
- 11/5/24 - MRI for his head
- 11/20/24 - Optometry visit
- 11/21/24 - appt with mental health
- **12/1/24 - At 7am, Jason went to the DTPD and dropped off documents that included medical records and his statement for the Victims' Advocate, Amber Mann**. He gave them to the officer behind the glass and told him to give them to Amber. He also told the officer that he was going to sue the PD for negligence and not protecting him as a citizen.
- 12/6/24 - Jason reached out to the **DA, Fran Chardo**, to ask him to review the assault case in which he was the victim. He explained what happened and asked that he review the facts, evidence, and medical records to determine if aggravated assault charges are more appropriate. Mr. Chardo responded, *"Our office received the below email forwarded to us.* (Jason initially sent it to the wrong department and they forwarded his email to Mr. Chardo.) *I read the police report this morning. I am very sorry to learn of the attack upon you. I am going to assign a deputy district attorney from the team that covers Derry Township to review the case to see if any action can be taken. Our office was not involved with the case prior to today. My initial review showed that we may be statutorily barred from further prosecution because Shoemaker pleaded guilty to the summary offense on October 10, 2024. Under Section 110 of the Crimes Code, that former prosecution generally bars a future prosecution for offenses that could have been charged arising out of the same event. I know this is not the result you seek. But I will have our prosecutor review the case exhaustively and determine if an exception applies."* **This was Jason's first time hearing that William had already been formally charged and that he pleaded guilty.**
  - In an additional email sent today, Chardo stated if they could find an exception to Section 110--which he was not confident they could do-- they would cite the fact that Jason was targeted as a veteran as an aggravating circumstance.
- **12/12/24- Jason called Amber Mann to see why she hadn't been in contact. She never received the documents, nor was she notified that he had stopped by.**
- 12/14/24 - I sent Amber the claim via email.
- **12/16/24 -Jason received a call from David Swartz, a Complex Claims Specialists for Selective Insurance, which insures Derry Township.** He stated that they weren't paying him anything because DTPD didn't cause his injuries. Jason said that DTPD is in charge of protecting their citizens. David asked Jason if he expected the police to escort him around town and stated that they don't have time for that. David went on to say that the **only reason that this occurred was because Jason was a military man. When Jason asked him what he meant, David said military people like to fight.** Jason reminded David that Veterans are a protected class, the same as African Americans and gay people.

- o Later that day, Jason called Selective Insurance's customer service line and talked with them about what happened. He broke down crying as he was relating the experience.
- 12/16/24 - Jason hung up with David and called the **VA Crisis line**. He explained what had been happening and how he was identified as being a soldier before being attacked by William Shoemaker, then victim-blamed because he was a veteran by a direct representative of DTPD. He told the social worker that he was in a mental crisis.
  - o Jason then called me at work and told me that he needed me to come home and explained the situation with Swartz and Jason told me that he had just gotten off the phone with the Crisis line. I spoke with social workers and his mental health nurse. We made an emergency counseling appointment for Jason for the next day.
- 12/17/24 - I took off work to take Jason to his counseling appointment. Unfortunately, due to the need for mental health, his next appointment isn't until the end of January.
- 12/18/24 - Emailed DA
- **12/20/24 - Amber finally was able to get a copy of the medical records from DTPD.** I asked her if this was from the missing paperwork that Jason dropped off on Dec 1, and she said yes, but to have the statement be returned, there would have to be a **"legitimate reason"** to return it. This paperwork was meant for Amber, not DTPD. They already had the copies that I dropped off on October 7.
- 12/25/24 - I gave him art supplies to help with mental health until he could get more counseling appts
- 12/26/24 - Jason began chiropractic treatment for his back
- 1/7/25 - VA appt - First Caregiver appointment. Because Jason isn't able to fully take care of himself, we are working with the VA to have me recognized as his caretaker.
- 1/13/25 - Whole health appt- A social worker went over what the VA can provide Jason in order to help him with his anxiety and healing.
- 1/15/25 - I took Jason to another emergency counseling session due to his anxiety about the case with DTPD.
- 1/27/25 - Caregiver appt - social worker meeting discussing needs for Caretaker.
- 1/29/25 - Social work appt - Whole Health - How they can help Jason achieve goals
- 1/29/25 - VA appt - Meeting with his counselor
- 1/30/25 - Neurology appt - Jason has hand tremors, headaches, and the back of his head (where he was hit) swells from time to time. He also has numbness in his arms when he coughs or sneezes. The doctor said he's still healing from his TBI and ordered an MRI to check his neck for slipped discs.
- 2/1/25 - Sent request to Zachary Jackson at the DTPD for records including the police report and all documentation for the 9/26 attack, documentation for the missing paperwork for Amber Mann, the victim's advocate, and documentation involving the incident between David Swartz and Jason; Jason was contacted on FB by Jackie Newton. She used terms like "homeless man" which Jason never used on social media. We think she may have some connection with the other party.
- 2/3/25 - Counseling appt
- 2/7/25 - Counseling appt

- 2/10/25 - Marriage counseling appt.  The effects of the attack have placed a lot of strain on Jason's relationship with me and our son.  He is short fused and hypersensitive. Jason has cut off all communication with my family and secluded himself to our house.

EXHIBIT K

I. PERSONAL & EMPLOYMENT INFORMATION 1. Full Name: Ma. Theresa Abanilla 2. Position Held in the Company: Executive Assistant 3. Company Affiliation (Check all that apply): □ ✓ Crimson Assist (U.S.) □ Kalinga Rice & Exports (Philippines) Other: _____ 4. ✓ Employment Duration: From January 24, 2024 to November 15, 2024 II. BUSINESS OPERATIONS & GROWTH BEFORE THE LAWSUIT 5. Describe the nature of your work and responsibilities in the company. My role involves a comprehensive range of administrative and operational responsibilities

aimed at supporting business efficiency and ensuring smooth day-to-day operations. A key aspect of my work is CRM database management, where I maintain and update client and project information, ensuring easy access to critical data for the team. I also handle various administrative tasks, such as managing schedules, coordinating meetings, and overseeing effective document organization and filing systems, both physical and digital.

In addition to administrative duties, I am responsible for bookkeeping, keeping track of financial transactions, managing invoices, and ensuring that all records are accurate and up to date. A significant part of my role also includes automating repetitive tasks to enhance efficiency, alongside managing email correspondence, ensuring timely responses and prioritizing communications based on urgency and importance.

Another critical area of my responsibilities includes preparing detailed construction quotes and ensuring that all necessary certifications are secured and maintained for project compliance. I also manage human resources tasks, which encompass maintaining employee records and supporting HR processes for recruitment, training, and general personnel management.

Throughout all of these responsibilities, I work closely with the CEO, Jason Todd, to ensure that operations run smoothly, business processes are optimized, and all necessary documentation is properly organized and compliant. This collaborative effort helps to drive the company's objectives forward and maintain a well-functioning, organized workplace.

6. How was the company performing before the attack and lawsuit? What business opportunities were in progress?

The company was thriving, with a strong and steady flow of operations. We were successfully managing multiple deals, and the momentum was built as we were on the verge of closing a major agreement. At one point, we were working on finalizing 10 business deals, diligently completing the necessary requirements for each. Jason remained highly consistent throughout this process, always dedicated to meeting the evolving needs of the business. His commitment to ensuring the success of the company and supporting his employees was unwavering, as he worked tirelessly to keep everything on track.

III. FINANCIAL & CAREER LOSSES

7. Did you experience a loss of income due to the lawsuit and business closures? If so, provide details.

~~Yes, I lost my job with Crimson Assist and Kalinga Exports and am now at risk of losing custody of my son. To manage my financial obligations, I've been drafting promissory letters to my creditors, requesting extensions on my loans and other payments. During this time, I've also struggled with severe depression and anxiety, which has only added to the difficulty of my situation. At this point,~~ I am facing significant challenges and feeling overwhelmed by everything I'm going through.

8. Were you part of any profit-sharing agreements or financial incentives that were lost due to company shutdowns?

Yes, as a result of the closure, all the opportunities that were once on the table were no longer pursued or followed through. The momentum we had built came to a halt, and any potential deals or initiatives were either put on indefinite hold or completely abandoned. Unfortunately, the inability to comply with the commitments and plans that had been in place before the closure left many opportunities unrealized, and the sense of progress we had worked hard for was lost.

IV. EMOTIONAL & PERSONAL IMPACT

9. Describe any stress, emotional harm, or reputational damage caused by the company's closure and the legal battle.

Yes, the company's closure and the ensuing legal battle have caused significant stress and emotional harm. The uncertainty and instability of the situation have taken a toll on my mental health, leading to heightened anxiety and frustration. The financial strain, combined with the emotional weight of seeing everything I worked for unravel, has been overwhelming. ~~Additionally, the legal complications have led to reputational damage, both professionally~~

and personally, affecting my credibility and relationships within the industry. The entire experience has been incredibly draining, leaving me struggling to rebuild both my confidence and my reputation.

10. How has this situation affected your future career opportunities and financial stability?

I am currently working part-time, but due to the significant losses and delayed payments, I find myself burdened with mounting compound loans. The financial strain has become overwhelming, and it feels as though there is no clear path to recovery. The weight of these obligations has left me feeling trapped, and despite my efforts, I struggle to see a way forward.

V. STATEMENT OF TRUTH & SIGNATURE

I, Ma. Theresa Abanilla certifies that the above testimony is true and accurate to the best of my knowledge. I understand that this statement may be used as legal evidence in Todd v. Derry Township & Selective Insurance.

Signature: _____

Date: 02/24/2025

# EXHIBIT L

**Testimony of Sadia Saeed**
**On Behalf of Jason R. Todd**
**Regarding Health Deterioration and Temporary Closure of CENPAMIL**
*Date: 02/05/2025*


**To Whom It May Concern:**


My name is Sadia Saeed, and I serve as the administrative lead and backoffice support for Jason Todd, founder of CENPAMIL. I am writing this testimony at Jason's request and with his explicit authorization, as his health conditions currently limit his ability to draft formal documents independently. This statement is intended to provide a factual account of the severe physical and mental health challenges Jason has faced following a traumatic incident, and the subsequent decision to temporarily suspend CENPAMIL's operations.


## Background of the Incident

On date Jason Todd was violently assaulted, resulting in a Traumatic Brain Injury (TBI) and permanent disabilities. Despite his efforts to seek justice, the Derry Township Police Department, including Officer Shearer and Chief Garth Warner, failed to investigate the crime or hold the perpetrator accountable. This institutional neglect compounded Jason's trauma and directly contributed to his deteriorating health.


## Physical Health Deterioration

Following the attack, Jason's physical health declined rapidly. Medical records confirm the following diagnoses:


**•Traumatic Brain Injury (TBI):** Characterized by chronic dizziness, memory lapses, and severe migraines.

**•Permanent Mobility Impairments:** Including balance disorders and reduced motor function, requiring ongoing physical therapy.

**•Chronic Pain:** Stemming from injuries sustained during the assault, managed only through prescribed medication.


These conditions have rendered Jason unable to perform basic tasks, let alone manage the demanding responsibilities of leading CENPAMIL. His physicians have repeatedly emphasized that continued stress would risk irreversible harm to his recovery.


## Mental Health Crisis

The psychological toll of the assault and subsequent institutional betrayal cannot be overstated. Jason, a U.S. military veteran, has been diagnosed with:


**•Severe Post-Traumatic Stress Disorder (PTSD):** Triggered by the attack and exacerbated by the police department's refusal to act.

•**Major Depressive Disorder:** Linked to feelings of helplessness and abandonment by systems meant to protect him.

•**Generalized Anxiety Disorder:** Manifesting in panic attacks, hypervigilance, and insomnia.

As having educational background in mental health I have felt that Jason's cognitive function and emotional stability have been critically impaired. His ability to focus, make decisions, or engage in professional work is currently untenable.

### Decision to Temporarily Close CENPAMIL

As Jason's primary administrative support, I witnessed firsthand how his health struggles made it impossible to sustain CENPAMIL's operations. After several consultations, Jason authorized me to initiate the temporary closure process on January 15ᵗʰ 2025. This decision was made solely to prioritize his health and allow him to focus on:

1. **Medical Rehabilitation:** Including TBI-specific therapies and mental health treatment.

2. **Legal Advocacy:** Pursuing accountability through formal complaints to the District Attorney, Pennsylvania Attorney General, FBI, and federal oversight bodies.

CENPAMIL's closure is not permanent but a necessary step to ensure Jason's survival and eventual return.

### Impact of Institutional Failures

The Derry Township Police Department's refusal to investigate this crime—coupled with Chief Garth Warner's complicity—has deepened Jason's suffering. The lack of justice has left him feeling targeted as a veteran and silenced as a victim. This systemic indifference is not only a personal betrayal but a broader societal failure that Jason is determined to expose through his ongoing advocacy.

### Conclusion

Jason remains committed to his recovery and to ensuring no other individual endures similar injustice. Updates regarding CENPAMIL's status will be shared when appropriate.

Respectfully submitted,
Sadia Saeed
Administrative Lead, CENPAMIL
Sadiasaed010@gmail.com
+923364261035

EXHIBIT M



# VA Radiology Reports

| | |
|---|---|
| **Source:** VA | |
| **Last Updated:** -- | |
| **Sorted By:** Date/Time Exam Performed (Descending) | |

VA Radiology Reports are available thirty-six (36) hours after they have been completed. Your VA provider may need more time to review the results. Some studies done at a non-VA facility may not be available or they may not necessarily include an interpretation. If you have any concerns about your reports, contact your VA health care team.

| | |
|---|---|
| **Procedure/Test Name:** CT HEAD W/O CONT | |
| **Date/Time Exam Performed:** 27 Sep 2024 @ 1758 | |
| **Ordering Location:** -- | |
| **Requesting Provider:** SAVINO,MICHAEL JOHN | |
| **Reason for Study:** assaulted. bruise/swelling post scalp. r/o bleed | |
| **Performing Location:** Lebanon PA VAMC | |
| **Clinical History:** | |
| **Radiologist:** -- | |

**Report**

Report:
Exam: CT head without contrast. CT maxillofacial without contrast.

Clinical history: Assaulted. Bruise/swelling post scalp. r/o bleed. Left face bruising/pain. Assaulted. r/o fx.

Technique: CT acquisition of the head and maxillofacial region without intravenous contrast. Reformatted images were obtained. The topogram was reviewed.

Comparison: CT head 5/3/2023.

Findings:

Head:

No evidence of acute hemorrhage, mass, mass effect, or midline shift. No CT evidence of acute/subacute transcortical infarction. No extra-axial fluid collections. The ventricles appear within normal limits. Mastoid air cells appear well-aerated. Bony calvarium appears intact.

Maxillofacial:

No acute facial bone fracture seen. The orbits and orbital contents appear grossly unremarkable. There are no metallic foreign bodies seen within the orbits. Trace paranasal sinus mucosal thickening. Small bilateral maxillary sinus mucous retention cysts. No paranasal sinus air-fluid level. Mild leftward nasal septal deviation.

Impression:
1. No evidence of an acute intracranial abnormality.
2. No acute facial bone fracture seen.
John D Nguyen
9/27/2024 6:23 PM
Primary Diagnostic Code: NORMAL

**END OF MY HEALTHEVET PERSONAL INFORMATION REPORT**

EXHIBIT O

# VA Radiology Reports

| | |
|---|---|
| **Source:** VA | |
| **Last Updated:** -- | |
| **Sorted By:** Date/Time Exam Performed (Descending) | |

VA Radiology Reports are available thirty-six (36) hours after they have been completed. Your VA provider may need more time to review the results. Some studies done at a non-VA facility may not be available or they may not necessarily include an interpretation. If you have any concerns about your reports, contact your VA health care team.

| | |
|---|---|
| **Procedure/Test Name:** CT MAXILLOFACIAL W/O CONT | |
| **Date/Time Exam Performed:** 27 Sep 2024 @ 1758 | |
| **Ordering Location:** -- | |
| **Requesting Provider:** SAVINO,MICHAEL JOHN | |
| **Reason for Study:** left face bruising/pain. assaulted. r/o fx | |
| **Performing Location:** Lebanon PA VAMC | |
| **Clinical History:** | |
| **Radiologist:** -- | |

**Report**

Report:
Exam: CT head without contrast. CT maxillofacial without contrast.

Clinical history: Assaulted. Bruise/swelling post scalp. r/o

bleed. Left face bruising/pain. Assaulted. r/o fx.

Technique: CT acquisition of the head and maxillofacial region

without intravenous contrast. Reformatted images were obtained.
The topogram was reviewed.

Comparison: CT head 5/3/2023.

Findings:

Head:

No evidence of acute hemorrhage, mass, mass effect, or midline
shift. No CT evidence of acute/subacute transcortical infarction.
No extra-axial fluid collections. The ventricles appear within
normal limits. Mastoid air cells appear well-aerated. Bony
calvarium appears intact.

Maxillofacial:

No acute facial bone fracture seen. The orbits and orbital contents appear grossly unremarkable. There are no metallic foreign bodies seen within the orbits. Trace paranasal sinus mucosal thickening. Small bilateral maxillary sinus mucous retention cysts. No paranasal sinus air-fluid level. Mild leftward nasal septal deviation.

Impression:
1. No evidence of an acute intracranial abnormality.
2. No acute facial bone fracture seen.
John D Nguyen
9/27/2024 6:25 PM
Primary Diagnostic Code: ABNORMALITY NOTED

## END OF MY HEALTHEVET PERSONAL INFORMATION REPORT

# VA Radiology Reports

*EXHIBIT P*

| | |
|---|---|
| **Source:** VA | |
| **Last Updated:** -- | |
| **Sorted By:** Date/Time Exam Performed (Descending) | |

VA Radiology Reports are available thirty-six (36) hours after they have been completed. Your VA provider may need more time to review the results. Some studies done at a non-VA facility may not be available or they may not necessarily include an interpretation. If you have any concerns about your reports, contact your VA health care team.

| | |
|---|---|
| **Procedure/Test Name:** CT CERVICAL SPINE W/O CONT | |
| **Date/Time Exam Performed:** 27 Sep 2024 @ 1758 | |
| **Ordering Location:** -- | |
| **Requesting Provider:** SAVINO,MICHAEL JOHN | |
| **Reason for Study:** See Clinical History | |
| **Performing Location:** Lebanon PA VAMC | |
| **Clinical History:** | REASON FOR EXAM: <br> assaulted. neck pain. r/o fx <br><br> PERTINENT PATIENT HISTORY: <br> hit with hard object, hit head on ground. neck pain <br> PLEASE VERIFY THE FOLLOWING: <br><br> 1. Patient weight is under 450lbs. Yes <br><br> 2. Is a mechanical device required for transfers? No <br> (If "yes", please note weight limit is 350 LBS !!!) <br> 3. Is patient a van rider? No |
| **Radiologist:** -- | |

**Report**

Report:
Exam: CT maxillofacial/sinuses without contrast.

Clinical history: Assaulted. Neck pain. r/o fx. Pertinent Patient

History: Hit with hard object, hit head on ground. neck pain.

Technique: CT acquisition of the paranasal sinuses without

intravenous contrast. Reformatted images were obtained. The total
DLP is 190.69 mGy*cm. The topogram was reviewed.

Comparison: None available.

Findings:
Cervical spine alignment maintained. Vertebral body heights preserved. The disc space heights appear grossly maintained. Multilevel mild endplate osteophyte formation. C2-C3 and C5-C6 mild central posterior disc protrusion. No significant central canal or neural foraminal narrowing. No evidence of an acute cervical spine fracture. The prevertebral soft tissues appear grossly unremarkable.

Impression:
1. No evidence of an acute cervical spine fracture.
2. Mild multilevel cervical spine degenerative changes.
John D Nguyen
9/27/2024 6:32 PM
Primary Diagnostic Code: ABNORMALITY NOTED

## END OF MY HEALTHEVET PERSONAL INFORMATION REPORT

EXHIBIT Q

# VA Radiology Reports

| | |
|---|---|
| **Source: VA** | |
| **Last Updated:** -- | |
| **Sorted By:** Date/Time Exam Performed (Descending) | |

VA Radiology Reports are available thirty-six (36) hours after they have been completed. Your VA provider may need more time to review the results. Some studies done at a non-VA facility may not be available or they may not necessarily include an interpretation. If you have any concerns about your reports, contact your VA health care team.

| |
|---|
| **Procedure/Test Name:** RIBS UNILAT+CHEST 3 OR MORE VIEWS |
| **Date/Time Exam Performed:** 27 Sep 2024 @ 1803 |
| **Ordering Location:** -- |
| **Requesting Provider:** SAVINO,MICHAEL JOHN |
| **Reason for Study:** assaulted. LEFT rib pain/ecchymosis. r/o fx |
| **Performing Location:** Lebanon PA VAMC |
| **Clinical History:** |
| **Radiologist:** -- |

**Report**

Report:
Exam: Rib series.

Clinical history: Assaulted. LEFT rib pain/ecchymosis. r/o fx.

Comparison: PA/lateral chest 3/8/2021.

Findings:

No evidence of an acute rib fracture or other evidence of an acute osseous abnormality. Mild rightward thoracic spinal curvature suggested.

Cardiomediastinal silhouette and pulmonary vasculature appear within normal limits. Well-inflated lungs. No focal pulmonary consolidation, significant pleural effusion, or evidence of pneumothorax.

Right abdominal surgical clips noted. Left abdominal bowel anastomotic sutures noted.

Impression:
1. No radiographic evidence of an acute rib fracture.
2. No evidence of an acute cardiopulmonary abnormality.
John D Nguyen
9/27/2024 6:38 PM
Primary Diagnostic Code: NORMAL

## END OF MY HEALTHEVET PERSONAL INFORMATION REPORT

# VA Radiology Reports

| | |
|---|---|
| **Source:** VA | |
| **Last Updated:** -- | |
| **Sorted By:** Date/Time Exam Performed (Descending) | |

VA Radiology Reports are available thirty-six (36) hours after they have been completed. Your VA provider may need more time to review the results. Some studies done at a non-VA facility may not be available or they may not necessarily include an interpretation. If you have any concerns about your reports, contact your VA health care team.

| | |
|---|---|
| **Procedure/Test Name:** MRI BRAIN W/O CONTRAST | |
| **Date/Time Exam Performed:** 05 Nov 2024 @ 1815 | |
| **Ordering Location:** -- | |
| **Requesting Provider:** HOOVER,STEPHANY ANNE | |
| **Reason for Study:** See reason below in Clinical History | |
| **Performing Location:** Lebanon PA VAMC | |
| **Clinical History:** | REASON FOR EXAM: recent head injury with LOC with some increase in forgetfullness, some balance issues |
| | PERTINENT PATIENT HISTORY: |
| | PLEASE VERIFY THE FOLLOWING: <br> 1. Does the patient have a pacemaker or implanted defibrillator? <br> No |
| | 2. Has the patient ever had rust or metal in eyes? <br> No |
| | 3. Is the patient prone to claustraphobia or any other panic disorder? <br> No (If yes, please order sedation medication) |
| | 4. Is the patient's weight under 450lb? Yes |
| | 5. Does patient require mechanical device for transfers? No |
| | 6. Is patient a van rider?   No |
| | 7. Does the patient have a prosthesis?   No |
| **Radiologist:** -- | |

| Report |
| --- |

Report:
Exam: MRI brain without contrast.

Clinical history: Recent head injury with LOC with some increase
in forgetfulness, some balance issues.

Technique: Multiplanar multisequence MR imaging of the brain
without intravenous contrast.

Comparison: CT head 9/27/2024 and 5/3/2023.

Findings:

There is no evidence of restricted diffusion to indicate acute
ischemia. There are a few scattered periventricular foci of
increased FLAIR signal. No evidence to indicate hemorrhage, mass,
mass effect, or midline shift. The pituitary/sella appears
grossly unremarkable on this exam. No extra-axial fluid
collections. The ventricles appear within normal limits. The
orbits and orbital contents appear grossly unremarkable. Mild
paranasal sinus mucosal thickening. Small bilateral maxillary
sinus mucous retention cysts. The flow voids within the skull
base appear grossly preserved.

Impression:
1. No evidence of an acute intracranial abnormality.
2. There are a few scattered periventricular foci of increased
FLAIR signal. Primary considerations typically include chronic
small vessel ischemic changes and demyelinating processes.
John D Nguyen
11/5/2024 7:22 PM
Primary Diagnostic Code: ABNORMALITY NOTED

## END OF MY HEALTHEVET PERSONAL INFORMATION REPORT

EXHIBIT S

# VA Radiology Reports

| | |
|---|---|
| **Source:** VA | |
| **Last Updated:** -- | |
| **Sorted By:** Date/Time Exam Performed (Descending) | |

VA Radiology Reports are available thirty-six (36) hours after they have been completed. Your VA provider may need more time to review the results. Some studies done at a non-VA facility may not be available or they may not necessarily include an interpretation. If you have any concerns about your reports, contact your VA health care team.

| | |
|---|---|
| **Procedure/Test Name:** MRI C SPINE W/O CONTRAST | |
| **Date/Time Exam Performed:** 11 Feb 2025 @ 1847 | |
| **Ordering Location:** -- | |
| **Requesting Provider:** ALI,MOHSIN | |
| **Reason for Study:** See reason below for Clinical History | |
| **Performing Location:** Lebanon PA VAMC | |
| **Clinical History:** | REASON FOR EXAM: H/O TBI 3 mo ago, c/o numbness of right arm when sneezing |
| | PERTINENT PATIENT HISTORY: |
| | PLEASE VERIFY THE FOLLOWING: 1. Does the patient have a pacemaker or implanted defibrillator? No |
| | 2. Has the patient ever had rust or metal in eyes? No |
| | 3. Is the patient prone to claustraphobia or any other panic disorder? No (If yes, please order sedation medication) |
| | 4. Is the patient's weight under 450lb? Yes |
| | 5. Does patient require mechanical device for transfers? No |
| | 6. Is patient a van rider?   No |
| | 7. Does the patient have a prosthesis?   No |
| **Radiologist:** -- | |

**Report** Report:

Exam: MRI cervical spine without contrast.

Clinical history: H/O TBI 3 mo ago, c/o numbness of right arm when sneezing.

Technique: Multiplanar multisequence MR imaging of the cervical spine without intravenous contrast.

Comparison: CT cervical spine 9/27/2024.

Findings:

Cervical spine alignment maintained. Vertebral body heights preserved. Disc space heights maintained. Signal within the included spinal cord appears grossly unremarkable. The paravertebral soft tissues appear grossly unremarkable.

At C2-C3, no significant central canal or neural foraminal narrowing.

At C3-C4, no significant central canal or neural foraminal narrowing.

At C4-C5, no significant central canal or neural foraminal narrowing.

At C5-C6, near midline posterior disc protrusion which abuts the thecal sac with mild central canal narrowing. No significant neural foraminal narrowing.

At C6-C7, no significant central canal or neural foraminal narrowing.

At C7-T1, no significant central canal or neural foraminal narrowing.

Impression: At C5-C6 there is near midline posterior disc protrusion which abuts the thecal sac and with mild central canal narrowing. No significant neural foraminal narrowing seen within the cervical spine. John D Nguyen 2/12/2025 3:35 AM

Primary Diagnostic Code: ABNORMALITY NOTED

## END OF MY HEALTHEVET PERSONAL INFORMATION REPORT

EXHIBIT T

https://drive.google.com/file/d/1vweR2nOrLh8GbHwFCRmiMSJ7RUtnhKFG/view?usp=drivesdk

VA Med

Records

EXHIBIT U



21:49



**C**  Chardo, Fran  Dec 6, 2024

to me ⌄

EXHIBIT V

Dear Mr. Todd,

*Sent to wrong dept. initially*

 Our office received the below email forwarded to us. I read the police report this morning. I am very sorry to learn of the attack upon you. I am going to assign a deputy district attorney from the team that covers that Derry Township to review the case to see if any action can be taken. Our office was not involved with the case prior to today.

 My initial review showed that we may be statutorily barred from further prosecution because Shoemaker pleaded guilty to the summary offense on October 10, 2024. Under Section 110 of the Crimes Code, that former prosecution generally bars a future prosecution for offenses that could have been charged arising out of the same event. I know this is not the result you seek. But I will have our prosecutor review the case exhaustively and determine if an exception applies.

*Francis T. Chardo*



SDVOSB Letter

PDF

**Chardo, Fran** Dec 6, 2024

to me, Jack ⌄

EXHIBIT W

Thank you for your service in our Armed Services. If I were a member of the General Assembly, I would absolutely support a change in the law that would provide a greater offense or a greater penalty for knowingly committing an offense against a disabled veteran or against a person because he or she is a veteran. Unfortunately, we are stuck with the law as it is and there is no such provision on the books currently in Pennsylvania. If we can find an exception to Section 110—and I am not confident that we will—we will cite the fact that you were targeted as a veteran as an aggravating circumstance. The prosecutor from that trial team will be in touch. The additional information provided below is helpful and I have forwarded it to that team.

● ● ●

**me** Dec 6, 2024

to Fran ⌄

Fran:

Just straight up with you, I'm not throwing bullshit on your plate for no reason.



M Gmail

Jason R. Todd <toddjason223@gmail.com>

EXHIBIT X

# Formal be Request for Investigation and Records – Officer Shearer's Conduct & Derry Township Police Misconduct

2 messages

Jason R. Todd <toddjason223@gmail.com> Mon, Feb 3, 2025 at 10:08 AM To: "Garth W. Warner (gwwarner@derrytownship.org)" <gwwarner@derrytownship.org>

To: Fran Chardo, Dauphin County District Attorney

CC: Chief Warren (Derry Township Police Department), Civil Rights Oversight Authorities

Dear District Attorney Chardo,

I am formally requesting a criminal and civil rights investigation into the conduct of Officer Shearer and the Derry Township Police Department regarding their handling of an assault case on September 26, 2024, in which I suffered a Traumatic Brain Injury (TBI) and permanent disabilities due to the actions of William Shoemaker.

The failure to investigate, protect my rights, and enforce the law raises serious legal concerns, including negligence, misconduct, and possible civil rights violations.

Records & Investigation Request

Pursuant to the Pennsylvania Right-to-Know Law (RTKL) and federal civil rights protections, I request full and unredacted copies of the following:

1. Incident Report & Investigation Documentation

• The full police report and all officer notes, statements, and investigative materials concerning the assault involving William Shoemaker on September 26, 2024.

• Any internal communications, emails, or directives regarding this case.

2. Officer Shearer's Disciplinary and Training Records

• A full disciplinary history, including all complaints, suspensions, and internal investigations.

• Proof of Officer Shearer's completion of mandatory training on assault investigations, de-escalation tactics, and handling incidents involving veterans.

3. 911 Call Logs, Dispatch Transcripts, and Officer Communications

• All 911 call recordings, radio transmissions, and dispatch logs related to this case.

• Any instructions given to Officer Shearer or other responding officers before or after arriving at the

scene. 4. Bodycam, Dashcam & Surveillance Footage

• All available footage from Officer Shearer and any other officers on duty during the response.

• Any security footage collected from businesses or homes near the scene.

5. Department Policy & Procedural Review

• Copies of the Derry Township Police Department's policies on handling assault investigations and responding to incidents involving veterans.

• Proof of training compliance with federal and state mandates on law enforcement interactions with disabled veterans.
Failure to Investigate and Potential Civil Rights Violations

Officer Shearer's failure to investigate, refusal to document my assault properly, and lack of enforcement action against William Shoemaker raise significant concerns about obstruction of justice, misconduct, and bias.

Additionally, the Derry Township Police Department's systemic failure to meet diversity and inclusion requirements regarding veteran participation in public safety initiatives and training programs further demonstrates a pattern of negligence and discrimination.

Action Requested

• A formal investigation into Officer Shearer's handling of my case and any history of misconduct.

• Immediate production of all requested documents, footage, and records within the legal timeframe.

• Clarification of whether Derry Township Police policies comply with state and federal standards for veteran protections.

I expect a prompt response and compliance with this request. Failure to provide these records may result in subpoenas, federal intervention, and further legal action.

Sincerely,

Jason R. Todd

223 Pineview Drive

Palmyra, PA 17078

(910) 818-1345

toddjason223@gmail.com

**Jason R. Todd** <toddjason223@gmail.com> Sun, Feb 23, 2025 at 8:32 PM To: Beth "Sandwich Maker" Todd <Bethtodd619@gmail.com>

[Quoted text hidden]

# EXHIBIT Y

MARY C. EBERLE
JOHN B. RICE
DIANNE C. MAGEE *
DALE EDWARD CAYA
DAVID P. CARO ◊
DANIEL J. PACL ◊ †
JONATHAN J. REISS
GREGORY E. GRIM †
PETER NELSON *
PATRICK M. ARMSTRONG
MATTHEW E. HOOVER
KELLY L. EBERLE *
COLBY S. GRIM
MICHAEL K. MARTIN
JOEL STEINMAN
MITCHELL H. BAYLARIAN
WILLIAM D. OETINGER
LINDSAY R. NORTON
DAVID A. KEIGHTLY, JR.
ERIK S. ALLGOOD

* ALSO ADMITTED IN NEW JERSEY
₊ ALSO ADMITTED IN NEW YORK
† MASTERS IN TAXATION
◊ ALSO A CERTIFIED PUBLIC ACCOUNTANT

**LAW OFFICES**
# GRIM, BIEHN & THATCHER

A PROFESSIONAL CORPORATION

SUCCESSOR TO
GRIM & GRIM AND BIEHN & THATCHER
ESTABLISHED 1895 AND 1956,
RESPECTIVELY

———

www.grimlaw.com

———

Patrick M. Armstrong

J. LAWRENCE GRIM, JR., OF COUNSEL
JOHN FREDERIC GRIM, OF COUNSEL

104 S. SIXTH STREET
P.O. BOX 215
PERKASIE, PA, 18944-0215
(215) 257-6811
FAX (215) 257-5374

(215) 536-1200
FAX (215) 538-9588

(215) 348-2199
FAX (215) 348-2520

February 7, 2025

Jason R. Todd
223 Pineview Drive
Palmyra, PA 17078

**Re:   Derry Township**

Dear Mr. Todd:

My name is Patrick Armstrong and I am the Derry Township solicitor. It has come to my attention that you have inquired about speaking during public comment at an upcoming Derry Township Board of Supervisors meeting. Please note that Derry Township has a policy that limits individuals to three (3) minutes during public comment. Please also note that Pennsylvania law provides for public comment only from those individuals that are residents and/or taxpayers of the municipality.

The Township of Derry has also learned that you have been using the Derry Township name, logo and/or likeness in recent social media posts without the approval of the Township. Please note that Derry Township has neither granted you permission nor consented to your use of the Derry Township name, logo and/or likeness. Therefore, please accept this correspondence as notice to stop using the Derry Township name, logo and/or likeness in your social media posts and/or other written materials. If you fail to stop using Derry Township's name, logo and/or likeness, we will be forced to proceed with the appropriate legal action against you, including but not limited to injunctive relief. Please note that we will seek monetary damages and attorneys' fees in the event we are forced to proceed with filing such a cause of action.

The Township has also been made aware of your claims regarding the conduct of the Township and/or Derry Township Police Department. It is the Township's position that many of your claims are inaccurate and false. In the event you would like to try and schedule a time to discuss your concerns with me and/or the Township, please let me know.

Page 2

Thank you for your attention to the foregoing.

Sincerely,

Patrick M. Armstrong, Esq.

Cc:    Zachary Jackson


**Cease and Desist – Violation of My First Amendment Rights & Retaliation Against a Disabled Veteran**

messages

Jason R. Todd <toddjason223@gmail.com>
o: "Chardo, Fran" <fchardo@dauphincounty.gov>, "Garth W. Warner (gwwarner@derrytownship.org)" <gwwarner@derrytownship.org>

Mon, Feb 10, 2025 at 11:49 A

**EXHIBIT Z**

To: Chief Warner, Derry Township Police Department

Derry Township Supervisors

From: Jason R. Todd

223  Pineview  Drive

Palmyra, PA 17078

Date: 10 February 2025

Chief Warner & Derry Township Supervisors,

I am formally notifying you that any further attempt to suppress my First Amendment rights through intimidation, legal threats, or restrictions on public discourse will be met with immediate legal action and a formal civil rights complaint to the U.S. Department of Justice (DOJ).

Your recent actions, including the baseless threat of legal action regarding my use of the Derry Township name and logo, as well as the attempt to discredit my legitimate and documented allegations against the Derry Township Police Department, constitute clear retaliation against a 100% disabled veteran and victim of violent assault who has been denied justice by your department.

**1. Attempted Suppression of Public Comment & Retaliation**

It is apparent that Derry Township is selectively enforcing public comment rules and misusing government resources to silence criticism. Any action taken to suppress my speech, deny my right to petition the government, or intimidate me from exposing police misconduct violates my constitutional rights under the First Amendment.

Furthermore, given that I am a disabled veteran, any retaliatory actions taken against me by Derry Township may also constitute a violation of the Americans with Disabilities Act (ADA) and federal anti-retaliation laws.

**2. False Allegations of "Unauthorized Use" of Township Name & Logo**

Your claim that I am not allowed to use the Derry Township name, logo, or likeness is legally indefensible. As a taxpayer and resident, I have every right to use public symbols in the context of criticism, reporting, and accountability. Your threats to pursue legal action are a clear abuse of power and an attempt to silence me through intimidation.

If you truly believe you have a legal basis for this claim, I challenge you to cite the specific Pennsylvania statute or federal law that prohibits such use. If no such law exists, then this is nothing more than an unlawful threat to suppress speech.

**3. Derry Township's Pattern of Negligence & Corruption**

This is not the first time Derry Township officials have failed in their duty to serve and protect. The Township and its police department:

• Failed to properly investigate my assault, despite clear evidence, including medical records and witness testimony.

• Neglected to file proper charges against my attacker, which resulted in a weak prosecution.

• Ignored and obstructed requests from a Victim Advocate, suppressing critical documentation.

• Engaged in ongoing retaliation against a disabled veteran for exposing these failures.

**4. My Demands**

• Cease & desist all intimidation tactics and suppression of my constitutional rights.

• Provide a formal public statement explaining why Derry Township Police failed to properly investigate my case.

• Schedule a public forum to address the documented misconduct of Derry Township Police and their failure to protect disabled veterans.

• Retract any baseless legal threats regarding my use of the township name and logo.

**5. Next Steps If This Continues**

If these unlawful actions do not immediately stop, I will:

• File a federal civil rights complaint against Derry Township with the U.S. Department of Justice (DOJ) for retaliation and suppression of free speech.

• Initiate legal action for violations of my constitutional rights, including potential claims under 42 U.S.C. § 1983 for government misconduct.

# EXHIBIT AA

**Garth Warner**

| | |
|---|---|
| **From:** | Jason R. Todd <toddjason223@gmail.com> |
| **Sent:** | Saturday, February 1, 2025 15:54 |
| **To:** | Garth Warner |
| **Subject:** | RTKR |

Right to Know Request – Derry Township

Under the Pennsylvania Right to Know Law (RTKL), you have the right to request public records from Derry Township. To build a strong case and expose misconduct, your request should cover the following:

### 1. Police & Law Enforcement Records

☑ Incident Reports: Full police reports and 911 call logs related to William Shoemaker's attack and any follow-ups.

☑ Use of Force Reports: All records of officer-involved incidents, including Officer Shearer's refusal to investigate.

☑ Body Camera & Dashcam Footage: Any video evidence from Derry Township Police regarding your encounter and other cases of misconduct.

☑ Internal Complaints & Misconduct Investigations: All internal affairs complaints and disciplinary actions against Officer Shearer and other officers.

☑ Police Training Manuals & Procedures: Full documentation on how Derry Township trains officers on bias recognition, de-escalation, and handling veterans.

☑ Arrest & Citation Data: Breakdown of arrests by race, gender, and veteran status to prove systemic bias.

☑ Emails & Communications: Internal emails discussing your case, Selective Insurance, and veteran-related issues between township officials, police, and insurers.

### 2. Government & Financial Records

☑ Veteran Participation Records: Proof that Derry Township failed to meet the 5% veteran participation requirement on the $205M police academy project.

☑ **Selective Insurance Agreements:** All contracts and agreements between Derry Township and Selective Insurance, including bad faith claim handling policies.

☑ **Public Funds Usage:** How Derry Township allocated funds for law enforcement training and veteran programs.

☑ **Legal Settlements:** A list of past lawsuits and settlements against Derry Township for police misconduct, civil rights violations, or discrimination.

3. Selective Insurance & David Swartz-Related Records

☑ **Swartz's Emails & Communications:** All correspondence between David Swartz, Selective Insurance, and Derry Township officials regarding your denied claim.

☑ **Claim Denial Policies:** Internal Selective Insurance policies on handling veteran-related claims and any evidence of bias in their decision-making.

☑ **Lawsuits Against Selective Insurance:** Any complaints, legal actions, or state investigations into Selective Insurance's history of claim denials in similar cases.

**Caution:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know that the content is safe.

**DERRY TOWNSHIP POLICE DEPARTMENT**

**EXHIBIT BB**

*An Accredited Law Enforcement Agency*

February 11, 2025

Jason R. Todd
223 Pineview Drive
Palmyra, PA 17078

Re:    Right to Know Law Request

Mr. Todd:

Thank you for your recent Pennsylvania Right to Know Law Request received by Derry Township on or about February 1, 2025, wherein you requested numerous generally described records of Derry Township and the Derry Township Police Department involving Jason Todd, William Shoemaker and/or other generally referenced records. Although you failed to use the requisite Right to Know Law Request form, the Township has reviewed your request and is providing this correspondence in response to it. Please be advised that your request is denied in part and granted in part for the reasons set forth herein.

First and foremost, your request lacks the requisite specificity under Section 703 of the Pennsylvania Right to Know Law and fails to specify the documents being requested and/or request specific records as defined in Section 102 of the Law. The general descriptions of the records being sought contained in your request do not provide sufficient information to enable the Township to ascertain which records are being requested. Without knowing the specific records being requested, the Township cannot provide you with such records and further cannot determine if such records are in fact public records or otherwise exempt. Therefore, your request is denied in that Derry Township cannot fully ascertain which records you are requesting.

Please also note that pursuant to Section 705 of the Right to Know Law, the Township is not required to create a new record that does not exist and/or to compile a record in a manner in which it does not currently compile. Your request asks for certain information and/or records that the Township is not believed to currently maintain and/or possess. Accordingly, to the extent your request asks for information that the Township does not currently possess in record form and/or for the Township to compile that information in a manner in which it is not currently compiled, the same is denied in accordance with Section 705 of the Law.

In addition to the above, Section 708(b)(16) of the Right to Know Law exempts records regarding criminal investigations. To the extent your request is asking for specific police report(s) and/or records that are directly related to a criminal investigation containing investigative information, including but not limited to complaints, investigative notes, victim information and additional investigative material, the same is denied. The Pennsylvania Commonwealth Court specifically found that documents relating to criminal investigations are exempt under the above section of the Right to Know Law in *PA State Police v. Office of Open Records*, 5 A.3d 473 (2010). Therefore, any records believed to be responsive to a







# DERRY TOWNSHIP **POLICE** DEPARTMENT

An Accredited Law Enforcement Agency

request for specific police reports and/or related investigative materials are exempt under Section 708(b)(16) of the Right to Know Law.

The Right to Know Law also specifically states that a public record is a record that is not exempt from being disclosed by other Federal or State law and/or that is not protected by privilege. Please note that the Pennsylvania Criminal History Record Information Act ("CHRIA") also prevents the release of investigative records. Therefore, your request is further denied in accordance with CHRIA.

Based on all of the foregoing, your request is partially denied. Without waiving the above, attached hereto please find a public record believed to be responsive to your request consisting of a citation with private information redacted. You may appeal this response pursuant to the current law in Pennsylvania which states the following in pertinent part under Section 1101 of the Right to Know Law:

...the requester may file an appeal with the Office of Open Records or judicial, legislative or other appeals officer designated under section 503(d) within 15 business days of the mailing date of the agency's response or within 15 business days of the deemed denial. The appeal shall state the grounds upon which the requester asserts that the record is a public record, legislative record or financial record and shall address any grounds stated by the agency for delaying or denying the request...

If you have any further questions regarding this response, please feel free to contact me.

Sincerely,

Garth Warner
Chief of Police/Police Department Right to Know Officer
Derry Township Police Department




620 Clearwater Road, Hershey, PA 17033 (717) 534-2202 Fax (717) 533-8220 www.derrypd.com

# M Gmail

EXHIBIT CC

## Public Comment Submission & Legal Notice for Tonight's Derry Township Meeting

2 messages

Jason R. Todd <toddjason223@gmail.com>

Tue, Feb 11, 2025 at 4:38 PM

To: "Garth W. Warner (gwwarner@derrytownship.org)" <gwwarner@derrytownship.org>, "Chardo, Fran" <fchardo@dauphincounty.gov>, Zachary Jackson <zrjackson@derrytownship.org>, Marie Sirkot <mariesirkot@derrytownship.org>, Julia Shirk <jpshirk@derrytownship.org>

Derry Township's Supervisors:

I am formally submitting this public comment for inclusion in tonight's Derry Township meeting minutes regarding my case and the township's ongoing suppression of public records and free speech.

Due to a scheduled MRI, I am unable to attend in person. However, I request that this statement be read into the record during the public comment portion of the meeting. This statement serves as an official legal record of my concerns and demands for action.

PUBLIC STATEMENT FOR TONIGHT'S MEETING

Good evening, my name is Jason R. Todd. I am a retired CW3 U.S. Army veteran and a 100% disabled citizen of this community.

On September 26, 2023, I was violently assaulted. Despite clear evidence, Derry Township Police failed to properly investigate the crime, and the case was undercharged as mere harassment.

I have requested public records under the Pennsylvania Right-to-Know Law (RTKL), and the township has denied access, despite the fact that:

• The case is closed, so no exemption applies.

• Police misconduct records are administrative and subject to public release.

• Selective Insurance and Derry Township have engaged in questionable communications regarding my case.

Furthermore, I was denied my right to speak at a previous township meeting. That is a violation of my First Amendment rights and the Pennsylvania Sunshine Act (65 Pa.C.S. §§ 701-716).

I am putting this township on formal legal notice.

If my Right-to-Know request is not properly fulfilled and if I am denied the right to speak again, I will pursue federal legal action against Derry Township for:

1. Civil rights violations under 42 U.S.C. § 1983 for suppression of speech.

2. Sunshine Act violations for obstructing public participation.

3. Potential RICO violations for the suppression of evidence and obstruction of justice.

This is not just about me—this is about transparency, accountability, and justice for all citizens.

M Gmail                                                              Jason R. Todd <toddjason223@gmail.com>

EXHIBIT DD

# Formal Request for Written Explanation of Meeting Denial

2 messages

Jason R. Todd <toddjason223@gmail.com>                             Sun, Feb 16, 2025 at 10:40 A

To: "Garth W. Warner (gwwarner@derrytownship.org)" <gwwarner@derrytownship.org>, "Chardo, Fran" <fchardo@dauphincounty.gov>,
Julia Shirk <jpshirk@derrytownship.org>, Zachary Jackson <zrjackson@derrytownship.org>, Marie Sirkot
<mariesirkot@derrytownship.org>, "Richards, Will" <will.richards@timesunion.com>, veterans@usdoj.gov

To: Chief G. Warner, Derry Township Police Department

CC: DOJ Civil Rights Division, Pennsylvania Attorney General, Federal Civil Rights Enforcement, Media Contacts

From: Jason R. Todd

Date: 16 February 2024

Chief Warner,

I am formally requesting a written explanation regarding your recent denial of my request to meet for coffee to discuss important matters regarding my case. You stated in a previous email, that you would not meet with me due to threatened litigation.

Your officers have coffee with the citizens of Derry Township on a regular basis. Why was I not given this opportunity to meet with you after I notified you of Derry Township's wrong doing?

I emailed you in good faith, requesting a simple meeting in a neutral setting to discuss concerns about my assault and the subsequent handling of the investigation. You declined my request without explanation. Given your position as Chief of Police, I find this refusal concerning, as it suggests a lack of willingness to engage in good-faith discussions regarding serious legal matters affecting me as a 100% disabled U.S. Army veteran.

As a public official, your refusal to meet raises several questions:

1. Why did you refuse to meet with me, a citizen and veteran, for a simple discussion over coffee?

2. Do you routinely deny meeting requests from other citizens, business owners, or community members?

3. Was your denial influenced by my legal actions, public statements, or disability status?

4. Does this refusal reflect an official position of the Derry Township Police Department regarding interactions with disabled individuals?

Your refusal appears to be part of a pattern of avoidance and obstruction by Derry Township officials, especially when considered alongside the Township Solicitor's cease-and-desist letter and the Police Department's failure to properly investigate my assault. If your denial was in any way related to my pending legal actions or disability status, this could constitute retaliation and discriminatory treatment under federal law.

I formally request that you provide a written response within 10 business days explaining the specific reasons for your refusal. If I do not receive a response, I will assume that this refusal was part of a broader effort to obstruct justice and suppress my rights, and I will escalate this matter accordingly to federal authorities, media outlets, and disability rights organizations.

I look forward to your timely response.

Sincerely,

Jason R. Todd

100% Disabled U.S. Army Veteran

Jason R. Todd <toddjason223@gmail.com>                             Sun, Feb 23, 2025 at 8:13 P

✓ Follow up tomorrow morning demanding a response.

This ensures that even though you can't physically be there, your message will still be on the record, putting legal pressure on the township to respond.

Let me know if you need any last-minute edits before submission!

---

**Jason R. Todd** <toddjason223@gmail.com>                                    Sun, Feb 23, 2025 at 8:14 PM
To: Beth "Sandwich Maker" Todd <Bethtodd619@gmail.com>

[Quoted text hidden]


**S E L E C T I V E**
BE UNIQUELY INSURED®

David Swartz
Selective Insurance Company of America
Mailing address for correspondence:
P O Box 7264
London, KY 40742
Phone#: (973)948-9204
Fax#: 877-233-0917
david.swartz@selective.com

December 16, 2024

Mr. Jason Todd                              *EXHIBIT EE*
223 Pineview Drive
Palmyra, PA 17078

_VIA EMAIL ONLY RECEIPT REQUESTED:_ toddjason223@gmail.com

RE:

| | |
|---|---|
| Insured: | Derry Township |
| Claimant: | Jason Todd |
| Claim Number: | 22699923 |
| Suspect: | William Shoemaker |
| Date of Loss: | 9/26/24 |

Dear Mr. Todd:

I am a Complex Claims Specialist employed by Selective Insurance Company of America, who is handling this claim on behalf of Selective Insurance Company of the Southeast ("Selective"). Selective insures Derry Township, Pennsylvania.

Thank you for discussing this matter with me. As you know, we are in receipt of your demand letter dated December 1, 2024, directed to the Derry Township Police Department regarding an incident which occurred on September 26, 2024. In the letter, you make a request for the Derry Township Police Department to reclassify the charges brought against the Suspect by elevating them to attempted murder with a hate crime enhancement; publicly acknowledge its failure to properly classify and investigate the incident; and implement mandatory training on handling cases involving veterans and protected classes, focusing on recognizing and addressing hate crimes.

You also seek compensation for medical expenses, lost income, and damages resulting from emotional and professional disruption.

After a careful review of this matter, including reviewing documents and speaking to individuals, no Derry Township police officer or employee caused your bodily injuries as a result of the controntation you had with the Suspect. As such, I do not see any liability on the part of the Derry Township Police Department or any of its officers or employees in which they caused your injuries.

As a consequence, I must respectfully deny your claim for compensation for medical expenses, lost income, and damages resulting from emotional and professional disruption.

If you have any questions, please contact me at (973) 948-9204.

Sincerely,

David B. Swartz
Complex Claims Specialist - Domiciled in Indiana

Claims activities are conducted by employees of Selective Insurance Company of America, either on its own behalf or as the servicing carrier for the Selective insurer affiliate which issued the policy that corresponds to the claim referenced above.

**Veteran Status**                                    **EXHIBIT FF**

2 messages

**Jason R. Todd** <toddjason223@gmail.com>                          Thu, Jan 23, 2025 at 9:06
To: "Garth W. Warner (gwwarner@derrytownship.org)" <gwwarner@derrytownship.org>
Cc: David Swartz <David.Swartz@selective.com>, "Chardo, Fran" <fchardo@dauphincounty.gov>, "Cielinski, Keith" <kcielinski@pa.gov>

Chief Warner,

Why was my Veteran Status given to Selective Insurance when there was no intent to file a hate crime?

My Veteran Status had absolutely no part in your report, but your police officers brought specific attention to this when filing my
insurance claim.
This is equivalent to your police officer saying,"Jason, a Black Jew, crossed the street. You know Black Jews have a tendency to be
violent. Therefore he deserved what he got."
Why was my status highlighted specifically?

Thank you,

Jason

JASON R. TODD
CW3, US ARMY (RETIRED)
CENTRAL PENNSYLVANIA MILITARY CONTRACTING COMPANY
PARTNER
910-818-1345

DUNS: 118536454
SAMS Number: HTARLPKC37N7
CAGE/NCAGE: 9A3F2

 CENPAMIL

**Jason R. Todd** <toddjason223@gmail.com>                          Sun, Feb 23, 2025 at 8:16 P
To: Beth "Sandwich Maker" Todd <Bethtodd619@gmail.com>

[Quoted text hidden]

**EXHIBIT GG**

## COMMONWEALTH OF PENNSYLVANIA
## NON-TRAFFIC CITATION

| | FILED 10/01/2024 | CITATION NO. E0001051-1 |
|---|---|---|

| Magisterial District Number | Docket Number | | Incident Number DT-24-13363 | MDJ Phone Number (717) 583-1912 |
|---|---|---|---|---|
| 12-3-04 | | | | |

| MDJ's Street Address | | City, State, Zip | Suffix | Driver's Number | State |
|---|---|---|---|---|---|
| 576 E MAIN ST | | HUMMELSTOWN, PA 17036 | | SECURE | XX |

| Defendant's First Name | Middle Name | Last Name | | City | State | Zip Code |
|---|---|---|---|---|---|---|
| WILLIAM | PAUL | SHOEMAKER | | HERSHEY | PA | 17033 |

| Defendant's Street Address | | | Sex M | Date of Birth | Resident Status RESIDENT | Defendant SSN SECURE |
|---|---|---|---|---|---|---|

| Race | | Ethnicity | | Parent Last Name | Date Notified | Time Notified |
|---|---|---|---|---|---|---|

| Juvenile? NO | Parents Notified? NO | Parent First Name | Parent Last Name | | Local Ordinance | |
|---|---|---|---|---|---|---|

| Charge | | | | | Section 2709 | Subsection A1 | TITLE 18 |
|---|---|---|---|---|---|---|---|
| HARASSMENT/PHYSICAL CONTACT | | | | | | | |

**Nature of Offense**
IN THAT, on or about said date, THE DEFENDANT, William Paul Shoemaker, with intent to harass, annoy or alarm another person, namely Jason R. Todd, did strike, shove, kick or otherwise subject such other person to physical contact, or did attempt or threaten to do the same: In that, Wit: THE DEFENDANT did strike another in the face with a lunch box he was carrying, In violation of Section 2709(a)(1) of the PA Crimes Code.

| | | FINE | | Lab Services Requested NO | Offense Date 09/26/2024 | Time 17:15 | Day THURSDAY |
|---|---|---|---|---|---|---|---|

| | | COSTS | | Offense Code 13B | Total Due | | |
|---|---|---|---|---|---|---|---|

| | | J.C.P.AT.J. C.J.E.A./O.A.G. | | Property Record No. | Initial Report YES | Filed on Info. Received YES |
|---|---|---|---|---|---|---|

| County DAUPHIN | County Code 22 | Twp-Boro-City DERRY TWP | Code 202 | Zone 04 | Attn I.CE NO | Military Service UNKNOWN |
|---|---|---|---|---|---|---|

| Location 1733 EAST CHOCOLATE AVENUE | | | | | | |
|---|---|---|---|---|---|---|

| Defendant's Signature-Acknowledges Receipt of Citation | | | Date 10/01/2024 | | FILED | |
|---|---|---|---|---|---|---|

I verify that the facts set forth in this citation are true and correct to the best of my knowledge, information and belief. This verification is made subject to the penalties of Section 4904 of the Crimes Code (18 Pa.C.S. 4904) relating to unsworn falsification to authorities. I certify this filing complies with the U.S. Case Records Public Access Policy.

| OFFICER'S SIGNATURE OFF SHEARER | | Officer ID NO. 3137 | ORI Number PA0221600 | Phone Number (717) 534-2202 |
|---|---|---|---|---|

**THIS CITATION HAS BEEN ISSUED/FILED BY A MEMBER OF THE DERRY TOWNSHIP, 620 CLEARWATER ROAD HERSHEY, PA 17033**

| Victim's First Name | | Initial Name | | Last Name | | Suffix |
|---|---|---|---|---|---|---|

| Date of Birth | Sex M | Race WHITE | | Ethnicity | Phone Number SECURE | |
|---|---|---|---|---|---|---|

| Remarks/Subpoena List | | | | | | |
|---|---|---|---|---|---|---|
| 12-3-04 PHONE = 717-583-1912 | | | | | | |

Philadelphia Regional Office, DAUPHIN



**EXHIBIT HH**

DEPARTMENT OF MILITARY
AND VETERANS AFFAIRS

## DISABLED VETERANS
## REAL PROPERTY TAX EXEMPTION CERTIFICATION

February 18, 2025

Jason R Todd
223 Pineview Dr
Palmyra, PA 17078

**Application is New**

The applicant listed above has applied to the Pennsylvania State Veterans' Commission for Real Estate Tax Exemption. The State Veterans' Commission has determined that the applicant has demonstrated the required financial need. Additionally, to assist the tax authority we have verified with the Department of Veterans Affairs that the applicant is totally and permanently disabled as a result of service connected causes incurred during a period of war or armed conflict. Therefore, it is recommended that the applicant be approved for the exemption of all real estate taxes on the above listed property.

If the application is a new claim, the qualified applicant shall be exempt from real property taxes that become due on or after January 28, 2025 .You must present this letter to your local tax authority to determine the precise tax period from which you will be exempt. You should know that taxes are considered due on the first day of a tax period even though payment may not be due for several months.

The State Veterans' Commission is required to review all property tax exemption cases at least once every five years for determination of CONTINUED FINANCIAL NEED. A review form will be mailed to the applicant sometime prior to the due date for review.

For the Commission.

Sincerely,

*Tracy Wylie-Perry*

Mrs. Tracy Wylie-Perry
Veterans' Service Specialist
Division of Programs and Services

EXHIBIT II

## I. PERSONAL & EMPLOYMENT INFORMATION

1. Full Name: Floyd Shad Mosquito

2. Position Held in the Company: Executive Assistant and VP of Kalinga Rice &

Exports 3. Company Affiliation (Check all that apply):

☐ Crimson Assist (U.S.)

☐ Kalinga Rice & Exports (Philippines)

Other: _____

4. Employment Duration: From January 24, 2024 to November 15,

2024 II. BUSINESS OPERATIONS & GROWTH BEFORE THE

LAWSUIT

5. Describe the nature of your work and responsibilities in the company.

My role involves a comprehensive range of administrative and operational responsibilities aimed at supporting business efficiency and ensuring smooth day-to-day operations. A key aspect of my work is CRM database management, where I maintain and update client and project information, ensuring easy access to critical data for the team. I also handle various administrative tasks, such as managing schedules, coordinating meetings, and overseeing effective document organization and filing systems, both physical and digital.

In addition to administrative duties, I am responsible for bookkeeping, keeping track of financial transactions, managing invoices, and ensuring that all records are accurate and up to date. A significant part of my role also includes automating repetitive tasks to enhance efficiency, alongside managing email correspondence, ensuring timely responses and prioritizing communications based on urgency and importance.

Another critical area of my responsibilities includes preparing detailed construction quotes and ensuring that all necessary certifications are secured and maintained for project compliance. I also manage human resources tasks, which encompass maintaining employee records and supporting HR processes for recruitment, training,

and general personnel management.

Throughout all of these responsibilities, I work closely with the CEO, Jason Todd, to ensure that operations run smoothly, business processes are optimized, and all necessary documentation is properly organized and compliant. This collaborative effort helps to drive the company's objectives forward and maintain a well-functioning, organized workplace.

6. How was the company performing before the attack and lawsuit? What business opportunities were in progress?

The company was thriving, with a strong and steady flow of operations. We were successfully managing multiple deals, and the momentum was built as we were on the verge of closing a major agreement. At one point, we were working on finalizing 10 business deals, diligently completing the necessary requirements for each. Jason remained highly consistent throughout this process, always dedicated to meeting the evolving needs of the business. His commitment to ensuring the success of the company and supporting his employees was unwavering, as he worked tirelessly to keep everything on track.

III. FINANCIAL & CAREER LOSSES

7. Did you experience a loss of income due to the lawsuit and business closures? If so, provide details.

Yes, I lost my job with Crimson Assist and Kalinga Exports and am now at risk of losing custody of my son. To manage my financial obligations, I've been drafting promissory letters to my creditors, requesting extensions on my loans and other payments. During this time, I've also struggled with severe depression and anxiety, which has only added to the difficulty of my situation. At this point, I am facing significant challenges and feeling overwhelmed by everything I'm going through.

8. Were you part of any profit-sharing agreements or financial incentives that were lost due to company shutdowns?

As a result of the closure, all the opportunities we once had were either put on hold or completely discarded. The momentum we had built came to a sudden stop, and any potential deals or initiatives were left stagnant. Unfortunately, the failure to meet prior commitments and follow through with our plans led to many opportunities going unrealized, and the progress we had worked so hard to achieve was lost.

## IV. EMOTIONAL & PERSONAL IMPACT

9. Describe any stress, emotional harm, or reputational damage caused by the company's closure and the legal battle.

The company's closure, along with the ongoing legal battle, has created immense stress and emotional turmoil. The constant uncertainty and instability have deeply affected my mental health, leaving me with heightened anxiety and frustration. On top of the financial strain, watching everything I worked for fall apart has been incredibly overwhelming. The legal issues have also damaged my reputation, both professionally and personally, impacting my credibility and relationships within the industry. Overall, the entire experience has been exhausting, and I'm now facing the difficult task of trying to rebuild my confidence and restore my reputation.

10. How has this situation affected your future career opportunities and financial stability?

I'm working part-time at the moment, but the financial strain from significant losses and delayed payments has left me with growing compound loans. It's becoming increasingly difficult to manage, and it feels like there's no clear solution in sight. The weight of these obligations is suffocating, and despite my best efforts, I can't seem to find a way out.

## V. STATEMENT OF TRUTH & SIGNATURE

I, Floyd Shad Mosquito certifies that the above testimony is true and accurate to the best of my knowledge. I understand that this statement may be used as legal evidence in Todd v. Derry Township & Selective Insurance.

Signature: _____

Date: 02/25/2025

EXHIBIT JJ

I. PERSONAL & EMPLOYMENT INFORMATION

1. Full Name: Dianna Caldedero

2. Position Held in the Company: Admin Assistant

3. Company Affiliation (Check all that apply):

☐ Crimson Assist (U.S.)

☐ Kalinga Rice & Exports (Philippines)

Other: _____

4. Employment Duration: From July 8, 2024 to November 15, 2024 II.

BUSINESS OPERATIONS & GROWTH BEFORE THE LAWSUIT 5.

Describe the nature of your work and responsibilities in the company.

Administrative Assistant plays a crucial role in ensuring the smooth operation of a business by handling a wide range of administrative and clerical tasks remotely. Their responsibilities include managing and organizing emails, scheduling meetings, maintaining digital records, preparing reports, and handling data entry with accuracy and efficiency. They serve as a vital point of contact between employees, clients, and management, facilitating seamless communication through virtual tools such as email, video conferencing, and messaging platforms. Additionally, they may be responsible for coordinating travel arrangements, processing invoices, managing office supplies remotely, and supporting various business functions as needed.

6. How was the company performing before the attack and lawsuit? What business opportunities were in progress?

The company was thriving, with a strong and steady flow of operations. We were successfully managing multiple deals, and the momentum was built as we were on the verge of closing a major agreement. At one point, we were working on finalizing 10 business deals, diligently completing the necessary requirements for each. Jason remained highly consistent throughout this process, always dedicated to meeting the

evolving needs of the business. His commitment to ensuring the success of the company and supporting his employees was unwavering, as he worked tirelessly to keep everything on track.

III. FINANCIAL & CAREER LOSSES

7. Did you experience a loss of income due to the lawsuit and business closures? If so, provide details.

Yes, I lost my job with Crimson Assist and Kalinga Exports and had to find new work, that time I'm helping my sister on her study so that's really sad to be lay off immediately.

8. Were you part of any profit-sharing agreements or financial incentives that were lost due to company shutdowns?

No, I was not part of any profit-sharing agreements or financial incentives that were lost due to company shutdowns. My compensation was not tied to any such programs, and my earnings were independent of the company's financial incentive structures.

IV. EMOTIONAL & PERSONAL IMPACT

9. Describe any stress, emotional harm, or reputational damage caused by the company's closure and the legal battle.

The company's closure and legal battle caused a lot of stress and uncertainty, making it difficult to plan for the future. It was emotionally draining to deal with sudden job loss and financial worries. Additionally, my professional reputation may have been affected, as potential employers could associate me with the company's troubles, making job hunting more challenging.

10. How has this situation affected your future career opportunities and financial stability?

This situation has affected my future career opportunities by making it harder to find stable full-time employment, as the company's closure may raise concerns for potential employers. Currently, I am working part-time, but it does not provide the same financial stability as a full-time job, making it challenging to cover expenses and plan for the future.

V. STATEMENT OF TRUTH & SIGNATURE

I, Dianna Caldedero certifies that the above testimony is true and accurate to the best of my knowledge. I understand that this statement may be used as legal evidence in Todd v. Derry Township & Selective Insurance.

Yes, I lost my job with Crimson Assist and Kalinga Exports and had to find new work, that time I'm helping my sister on her study so that's really sad to be lay off immediately.

8. Were you part of any profit-sharing agreements or financial incentives that were lost due to company shutdowns?

No, I was not part of any profit-sharing agreements or financial incentives that were lost due to company shutdowns. My compensation was not tied to any such programs, and my earnings were independent of the company's financial incentive structures.

IV. EMOTIONAL & PERSONAL IMPACT

9. Describe any stress, emotional harm, or reputational damage caused by the company's closure and the legal battle.

The company's closure and legal battle caused a lot of stress and uncertainty, making it difficult to plan for the future. It was emotionally draining to deal with sudden job loss and financial worries. Additionally, my professional reputation may have been affected, as potential employers could associate me with the company's troubles, making job hunting more challenging.

10. How has this situation affected your future career opportunities and financial stability?

This situation has affected my future career opportunities by making it harder to find stable full-time employment, as the company's closure may raise concerns for potential employers. Currently, I am working part-time, but it does not provide the same financial stability as a full-time job, making it challenging to cover expenses and plan for the future.

V. STATEMENT OF TRUTH & SIGNATURE

I, Dianna Caldedero certifies that the above testimony is true and accurate to the best of my knowledge. I understand that this statement may be used as legal evidence in Todd v. Derry Township & Selective Insurance.


Signature: _____

Date: 02/24/2025